

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 31, 2012

<u>VIA ECF AND HAND DELIVERY</u>

The Honorable John Gleeson
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Glenn Mazzella
     <u>Criminal Docket No. 11-0026 (JG)</u>

Dear Judge Gleeson:

   The government respectfully submits this letter regarding the defendant Glenn Mazzella's sentencing, which is scheduled for February 3, 2012, at 2:00 p.m. On September 15, 2011, Mazzella pled guilty to Count Two of the above-referenced indictment, charging Hobbs Act extortion conspiracy, in violation of 18 U.S.C. § 1951(a).

   In his sentencing memorandum dated January 26, 2012, the defendant requests a downward departure based on extraordinary family circumstances, and a non-incarceratory sentence of probation.  The government does not oppose a downward departure based upon the grounds set forth in the defendant's memorandum.  Nevertheless, for the reasons set forth herein, the government respectfully submits that a term of incarceration is appropriate based on the facts of this case.

I. <u>The Applicable Sentencing Guidelines Range</u>

   As set forth in the Pre-Sentence Investigation Report ("PSR") the Probation Department has determined that the defendant's total offense level is 19 and his Criminal History Category is I, resulting in an advisory Sentencing Guidelines range of 30 to 37 months. (PSR ¶ 102).  The Probation Department's calculation includes a two-point enhancement for an implied threat of bodily injury, as well as a two-point enhancement for the defendant's leadership role in the offense.

   The government's plea agreement, by contrast, estimates the defendant's total offense level to be 14.  The government's

calculation does not include enhancements for leadership role or the threat of bodily injury.  It does include a one-point "global" deduction to reflect the decision by Mazzella's co-defendants to plead guilty and avoid the need for a trial.  Accordingly, the government estimates the applicable Sentencing Guidelines range to be 15 to 21 months.  While the government does not dispute the potential applicability of enhancements for leadership role and the implied threat of bodily injury in light of the facts and circumstances of this case, the government is bound by the terms of the plea agreement and stands by the Guidelines estimate set forth therein.

II.   <u>Section 3553(a) Factors</u>

    A.   <u>Nature and Circumstances of the Offense</u>

      The charges in this case stem from a long-term investigation involving a proactive cooperating witness ("CW"), identified in the indictment as John Doe #1, who made consensual recordings of numerous organized crime members and associates over a period of close to four years.  The defendant Mazzella is an associate of the Genovese crime family of La Cosa Nostra (the "Genovese family") who is assigned to the crew of his biological uncle, longtime Genovese soldier Daniel Cilenti.  His co-defendants, Dominic Caramanica and Peter Pace, are also associates in Cilenti's crew.

      As part of one of the charged extortion conspiracies, Mazzella demanded cash kickbacks from John Doe #1, who was active in the construction industry in New York and New Jersey, in exchange for providing John Doe #1 with opportunities to work on construction projects in the New York area.  For example, excerpted below is a portion of a conversation among Mazzella, his co-conspirator Pace, and John Doe #1 that was consensually recorded by John Doe #1 on September 28, 2009.  During the conversation, Mazzella and Pace discussed with John Doe #1 kickbacks they contended he owed for projects on which he had worked with Pace.  Mazzella suggested that John Doe #1 pay a kicback of $3,000 as an "acknowledgement" for the past work, and three-quarters of a percentage point of revenues for future projects:

      MAZZELLA:      Let's just do it on a gross dollar figure instead of on yards? Make it easier. Let's just do it on a gross dollar figure, ok? So now- make it easier. You tell me what's good, what's reasonable, what's fair. For every fifty thousand (UI), use that as an increment?

|  | What's reasonable? You guys know the margins- you don't want to hurt 'em. We just want acknowledgement, that's all. |
|---|---|
| John Doe #1: | We work on a . . . on a ten, twelve percent profit margin. |
| MAZZELLA: | Net? |
| John Doe #1: | Yeah. |
| MAZZELLA: | Okay. What's . . . what do you expect the number to be over the next six months? Let's . . . let's shorten it up a little- let's go six months in- |
| PACE: | Well I dunno how much (UI) everything I got. Everything included in my bid, about three or four hundred thousand (UI). |
| John Doe #1: | Yeah. |
| PACE: | That should be, cause, I dunno . . .I would say four hundred thousand- |
| John Doe #1: | And there's gonna be- |
| PACE: | I would say four hundred thousand (UI). |
| John Doe #1: | Then he's got Harlem Hospital. Then he's got Harlem Hospital. |
| PACE: | Harlem Hospital is a big job. |
| John Doe #1: | Harlem Hospital... Harlem Hospital. Then there's Fed Ex, which I gave him. |
| PACE: | Right, Fed Ex is what I'm talking about. Now he brought me into Harlem Hospital. That's another job. That's going first, Harlem Hospital- |
| MAZZELLA: | Is three quarters of a point reasonable? |
| John Doe #1: | It's more than reasonable. |
| MAZZELLA: | It is, right? |

3

John Doe #1:     Yeah.

MAZZELLA:        Okay. So why don't we use three quarters
                 of a point, okay? That's nowhere near
                 getting into somebody's fucking, uh,
                 lunch.  That's . . . that's just thank
                 you, a little acknowledgment, and we're
                 always there- whatever you need.  Okay?

      In addition to John Doe #1, Mazzella and his co-
conspirators also extorted another individual, identified in the
indictment as John Doe #2, who owed John Doe #1 a legitimate
business debt.  Mazzella and Cilenti then indicated to John Doe
#1 that they expected to receive a percentage of the repaid debt
as payment for their illegal collection efforts.  For example,
the following is an excerpt from a consensual recording
on December 8, 2009, in which Mazzella directed Caramanica to visit
John Doe #2 to obtain payment from him:

MAZZELLA:        [On the phone]  We got a guy we're doing
                 business here. . . his name, you got a
                 pen?  Take your time 'cause I give you
                 some things to write down.  There's a
                 place in. . .  OK.  Are you ready?  Our
                 friend is [John Doe #1].  He is also a
                 friend of, uh, our friend in Yonkers
                 [Cilenti].  Uh, he owns a trucking
                 outfit.  And he's owed 50 grand from a
                 company called Ecology Enterprises.
                 Ecology Enterprises doesn't, we don't
                 have a street address, but I have a
                 diagram here to where it is.  It's in
                 Freehold and it's at the intersection of
                 Five Points Road and Route 33.  And if
                 you, I don't know if you have a fax
                 machine or if you could get to one, but
                 I could fax you a diagram of how to get
                 there.  Now, the fellow [John Doe #1]
                 regularly contributes. And he's having
                 an issue. . .  yes.  And he's having an
                 issue with this 50.  And . . .  the 50
                 is a legitimate debt for trucking that
                 he used.  And he's avoiding [John Doe
                 #1], [John Doe #1 has] been to his
                 place, 10, 15 times. . .

John Doe #1:     I just signed a release.

4

> MAZZELLA:  . . . And he, and he, and in addition to owing him 50 he won't release the lien which he was paid for already on a job site.  He is holding up work . . . but you know Etre?  I don't know if you remember them.  It's another company [UI].  So anyway the point is, since geographically you're there if you go by and look for the owner and talk to him, just talk, and make sure that he contacts [John Doe #1] and pays him.  And you know, you understand.

Thereafter, on December 16, 2009, Mazzella described to John Doe #1 a phone conversation he had had with John Doe #2 concerning the debt:

> MAZZELLA:  I got him [John Doe #2] on the phone last night after I spoke to you.
>
> John Doe #1:  Okay.
>
> MAZZELLA:  Very docile, very accommodating.  He says 'Oh listen, this is, I don't know how this mess got to this point.  And, uh, you know, I'm very sorry.  I plan on straightening it out soon.'  So I said, 'Alright listen, I'm not really interested in why, I don't really want to hear the whole story.  I only want one question:  Do I have to come back next week or are you going to straighten this out with my friend?' 'Oh no, no.  It's all straightened out.  I spoke to him, we're going to handle it.'  I said, 'So, okay, so in other words, I'll check in in a week and he'll tell me it's all done.'  So he says 'Yeah' and I said, 'Paid in full?'  He says 'Yeah. I got to talk to him and this and that.'  [phone ringing]  I said, 'Well, don't start that again.'"

Mazzella then explained to John Doe #1:  "If there's ever any place where we can squeeze somebody else for bread and get them more time, let's do that too. . . .  Like what we're doing with this guy, we could do it with ten guys.  You know what I mean?  We'll just get paid faster."  In the wake of the extortion, John Doe #2 ultimately made payments totalling $15,000 to John Doe #1,

before John Doe #1's proactive cooperation efforts were terminated at the direction of the government.

B.   <u>History and Characteristics of the Defendant</u>

The defendant is, as noted, an associate of the Genovese family in the crew of his biological uncle and co-defendant, Daniel Cilenti.  Although his prior criminal record is limited to a single assault committed at the age of 18 – for which he was adjudicated a youthful offender – the defendant was a willing and even eager participant in the charged crimes, whose association with organized crime was purely voluntary and deliberate.

The government does not dispute that the defendant is also a devoted father who cares deeply about his children and is, following the death of his wife, their primary caregiver. The government also does not dispute the unique needs the defendant's children face in light of the conditions described in the defendant's sentencing memorandum.  Accordingly, consistent with the plea agreement, the government does not oppose a downward departure from the applicable Sentencing Guidelines range based on extraordinary family circumstances.

At the same time, the government notes that the defendant's involvement in the charged extortions occurred in 2009 and 2010 – after his wife's death, at a time when he was well aware of his responsibilities to his children.  Given those circumstances, the government respectfully submits that the defendant's decision to engage in criminal activity, and to expose himself and his family to the consequences, weighs in favor of a sentence that includes a period of incarceration.[1]

C.   <u>The Need for the Sentence Imposed</u>

This Court is well acquainted with the scourge that organized crime is on society.  Although this case involved no outright acts of violence, it exemplifies some of the ways in which members of organized crime have entangled themselves in the construction industry in New York City, and use their position to extract illegal kickbacks from participants in that industry, simply as a cost of doing business.  The facts of this case –

_____

[1]   Although incarceration would undoubtedly pose a hardship for the defendant's family, there appear to be other close relatives – including grandparents and aunts and uncles – who could care for the defendant's children during such a limited period.

including the defendant's role as an associate in the Genovese family, the nature and circumstances of the charged crime, and the defendant's active role in that crime – all weigh in favor of a period of incarceration.

The defendant has, to date, spent just a single night in jail for the crime he has now acknowledged committing.  He was arrested on the morning of January 20, 2011, and released on bail the following day.  Since that time, he has taken multiple vacations, including to Florida and upstate New York.  Under these circumstances, the government respectfully submits that although a downward departure for extraordinary family circumstances may be appropriate, a sentence that includes no jailtime would fail to reflect the seriousness of the offense, to promote respect for the law, and to provide adequate deterrence or just punishment.

III. <u>Conclusion</u>

For the foregoing reasons, the government respectfully submits that a sentence of probation alone would be insufficient on the facts of this case, and that a sentence that includes a period of incarceration would better fulfill the ends of justice.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:   <u>/s/ Stephen E. Frank</u>
      Stephen E. Frank
      Assistant U.S. Attorney
      (718) 254-6143

cc:  Michael Rosen, Esq. (by email and ECF)

7